## Case No. 260.

In re ALSBERG et al.

[9 Ben. 17.][2]

District Court, S. D. New York. Jan. 1877.

VOLUNTARY BANKRUPTCY—ADJUDICATION—COMPOSITION.

Where a petition in voluntary bankruptcy was filed, and the debtor thereafter, before an adjudication, began proceedings for a composition under the Act of June 22d, 1874, an adjudication ought not to be made merely because certain creditors ask for it, if the debtor does not ask for it.

[1][Reported by Hon. William Cranch. Chief Judge.]
[2][Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted, by permission.]

---

## Case No. 261.

In re ALSBERG.

[16 N. B. R. 116.]

District Court, D. Delaware. Jan. 6, 1877.

Circuit Court, D. Delaware. June 29, 1877.

BANKRUPTCY — NONDISCHARGEABLE DEBTS — ARREST OF BANKRUPTS — CONFLICTS WITH STATE COURTS—EVIDENCE

[1. Where A. purchases a stock of goods, intending not to pay for them either in whole or in part, he "creates a debt by fraud," within Act Cong. 1867, providing that, as to debts so created, a bankrupt shall not be entitled to a discharge.]

[2. Where, pending bankruptcy proceedings, the bankrupt is arrested on process in an action at law in a state court, on a debt from which the bankrupt is not entitled to a discharge, (Rev. St. § 5107,) because contracted in fraud, (section 5117,) he will not be entitled to a release on habeas corpus, on the ground that the debt in question was provable in the proceedings in bankruptcy.]

[3. In such case, in determining whether the debt was so contracted in fraud, the court is not bound by the case made in the state court, but may consider all legal evidence brought before it from any quarter bearing on the question.]

[Approved in Re Van Buren, Case No. 16,833.]

[Petition by Martin Alsberg, a bankrupt, for writ of habeas corpus. Denied on January 6, 1877. Bankrupt petitioned for a rehearing on May 8, 1877. Denied on June 15, 1877. Petition of the bankrupt to set aside orders of district court denied by circuit court on June 29, 1877.

[The bankrupt, who had failed as a dry-goods merchant in 1873, settled with his creditors, and resumed business in September, 1875, when he purchased about $9,000 worth of goods. In January, 1875, he sold a house for $1,500; and in June, 1875, he sold another, and took $3,000 cash, and a mortgage for $500, which mortgage he subsequently sold. March 4, 1875, he sold another house to one Rehfuss, and took $2,500 cash, and a mortgage for $2,000; and on March 25, 1876, he sold his last house for $1,242 cash. When purchasing in July and September,

1875, and in April, 1876, he made certain representations. By making large sales, paying all bills in 10 days, and obtaining discounts, he re-established his credit, and purchased closely till April 24, 1876, when he began to purchase freely and even recklessly. He failed July 12, 1876, and a meeting of his creditors was called for July 18th, at 3 P. M. In September, 1875, the bankrupt gave his mother-in-law, Rosa Buxbaum, a judgment bond for $4,200, which was entered the day of his failure, and on which execution was issued, and placed in the hands of the sheriff, at 10 A. M. on July 18, 1876. The report of the bankrupt to his creditors showed his liabilities to consist of book debts, $13,094.90; and Buxbaum judgment, $4,200. His assets consisted of accounts due, $4,000; the Rehfuss mortgage, $2,000; and stock on hand, $8,000 or $9,000. No arrangement having been made at the creditors' meeting, the bankrupt continued to sell until the sheriff took possession, in October. The goods were sold in bulk by the sheriff on October 20th to Albert Alsberg, for $3,500; and he resold them the same day to the bankrupt's wife for the same price, and took seven promissory notes from her in payment.]

Charles B. Lore, Sam'l M. Harrington, and J. H. Hoffecker, for creditors.

William G. Whiteley and Anthony Higgins, for bankrupt.

BRADFORD, District Judge. The petitioner, Martin Alsberg, in this habeas corpus case, has been imprisoned in the common jail of New Castle county, on certain writs of capias ad respondendum issued out of the superior court of the state of Delaware, at the instance of creditors of the said Alsberg in Philadelphia, Pa. Under a late act of assembly of the state of Delaware, abolishing the use of these writs in civil actions generally, the exception is made when the plaintiffs file written affidavits of fraud, stating, in the language of the act, "that to the best of his or their belief the defendant had absconded, or is about to abscond, from the place of his usual abode, or that the defendant is justly indebted to the plaintiff in a sum exceeding fifty dollars, and that he verily believes the said defendant has secreted, conveyed away, assigned, or disposed of either money, goods, chattels, stock securities for money, or other personal estate or real estate of the value of more than one hundred dollars, with intent to defraud his creditors, and shall moreover in such affidavit specify and set forth the supposed fraudulent transactions." After Martin Alsberg (the petitioner for discharge under the writ of habeas corpus) had filed his voluntary petition as a bankrupt, and the jurisdiction of the United States district court for this district had attached to all persons, matters, and things having any relation to

the estate of the bankrupt, he was taken on these writs, issued under the authority aforesaid, and grounded on the affidavits required by law which justified their issuance. Under these circumstances, the petitioner has invoked the aid of this court to release him from imprisonment, on the ground that he would have a right to be discharged from these debts under his certificate of discharge in a court of bankruptcy, and that to permit his imprisonment, after the jurisdiction of the bankrupt court had attached, would be unjust to the petitioner, and defeat the purpose for which the bankrupt law was enacted, and in violation of the following, viz.:

Section 5107, tit. 61, Bankruptcy Revised Statute of the United States: "No bankrupt shall be liable, during the pendency of the proceedings in bankruptcy, to arrest in any civil action, unless the same is founded on some debt or claim from which his discharge in bankruptcy would not release him." We turn to another part of the act, and we find the character of the debt which will not be discharged, in these words: In section 5117, tit. 61, c. 5, Rev. St., it is provided: "No debt created by the fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in any fiduciary character, shall be discharged by proceedings in bankruptcy, but the debt may be proved and the dividend thereon shall be a payment on account of said debt." So that we are brought directly to the question, Were these debts on which these capiases have been issued "created by the fraud of the bankrupt," or not? There is no proof going to show embezzlement or abuse of a fiduciary trust, either public or private, and as these are all the delinquencies enumerated in the statute which give the debt such a character as to forbid its discharge, we must confine ourselves to that simple investigation—fraud in the bankrupt in creating the debt. If there was such fraud, then a certificate of discharge will not free him from the debt, and by the terms of the bankrupt act (section 5107, above quoted) he is not freed from arrest by the state courts in civil suits. If there was not such fraud, then he will be discharged, for it is then such a debt as would be discharged by the certificate of discharge granted finally to the bankrupt.

Were these debts created by the fraud of the bankrupt? There is no principle of law or equity more universally acceded to than "that fraud is never to be presumed." It must always be proved, and when the matter of a man's personal liberty is in issue, it ought to be convincingly proven. And yet fraud is of such a character, lies so buried up in a man's secret intentions, as to be inaccessible to ordinary observations. It would defeat its own purposes were it outspoken, and hence secrecy is its favorite hiding-place. Fraud is a deceit practiced to another man's disadvantage; there must be

an intent to mislead, carried into operation by some act, on which the deceived party rests to his own detriment. Human courts do not attempt to punish men for wicked intentions which have never been acted on. Such sins of intent are reserved for punishment by a High Tribunal, of greater justice and penetration than earth can furnish. There is no distinction between a fraud proven in a court of law and a fraud proven in equity. For while courts of equity furnish greater facilities for discovering and uprooting fraud than courts of law, yet when once proven in a court of law, it is equally damaging to the perpetrator. Now in proof of fraud, as its essence is in the "scienter," the "animus," the "evil intentions," things that cannot be seen or heard and are not cognizable by the senses, we are to take into consideration the declarations and conduct before, at the time, and after the alleged fraudulent act (and a wide latitude of investigation is to be allowed), and from these declarations and this conduct we are to draw our inference as to the existent or non-existent fraud at the time of the purchase of the goods in question. Slight evidences of fraud will not suffice. They must be convincing.

It is contended by the creditors that the bankrupt contracted these debts by practicing two distinct forms of fraud: 1. By false representation of his available means to pay any indebtedness he might incur, which operated on the vendors as inducement to make the sales, and without which they would not have made them, and 2. By fraudulently intending, at the time of these purchases, not to pay them in whole or in part.

It is not pretended that false representation of means for the payment of debts were made to more than three creditors, viz.: Hood, Bonbright & Co., Langfeld, Lichten & Co., J. T. Way & Co. And were this the only form of fraud practiced, I should discharge the petitioner from arrest in all cases except in those above named. Now, how far have false representations of available means made to these creditors induced them to sell the goods for the price of which they have brought suits in the superior court? The first statement of this kind was made to Mr. Crow, between the 1st of April and May, of the year 1876, in the railroad cars, between this place and Philadelphia. Mr. Crow was the traveling and selling agent of this firm. Alsberg said "he could pay two dollars to every one he then owed." In July, 1875, Alsberg said to Benj. H. Cregor, who had charge of the credit department of this firm, that "he held real estate worth near twenty thousand dollars." Mr. Cregor said that his credit was based on this representation then made. About two months before the failure, Alsberg said to Robert Mills, salesman for Langfeld, Lichten & Co.: "You ought to sell me cheap, for I (referring to the failure of Mr. Wainright) am worth two dollars for every one

I owe." About this time, as it appears, he stated to Henry M. Rosenbaum, the financial manager of the last-mentioned firm, that he was worth twenty-five thousand dollars, "you need have no fear of me" (commenting on Wainright's failure), and stating that he had a couple of properties in Wilmington. Witness then stated that he would have sold if he had stated nothing about his property. Witness afterwards modified this statement and said: "The effect of this statement as to property then made prevented me from making future inquiry, which if I had made and had found his statements false I would not have given him the subsequent credit I did." He further said: "I cannot say that I mentioned this conversation as to the property to any member of the firm. I understood the two properties to be part of the twenty-five thousand dollars." He said on one occasion that he had a property on King street worth twelve thousand dollars. The exact date of this conversation is not on my notes—he said this to William Marter, salesman for J. T. Way & Co. Marter says his line of credits was due altogether to his statements—he did not after modify them.

These by my notes constitute all the cases of false representations as to the value of his property. It is true that these statements are materially untrue. They doubtless assisted the vendors in making up their minds to give the credit they did, in cases where the information had before been communicated to them. But when the purchaser had for a considerable period of time bought freely, and commended himself to their confidence by extraordinary promptness of payment (as is testified to on all sides), would they have refused these last credits, if they had heard nothing of Alsberg's property? The fact is, Alsberg had gained the trust of these creditors by his prompt payments, and they solicited his purchases (as was most natural and legitimate). Mr. Rosenbaum said he would have sold if he had heard nothing of Alsberg's property, and this is inconsistent with the attempted modification of that answer, to wit: that without this statement he would have started an inquiry as to Alsberg's means. This could not be, for if he had sold, he would have given the credit, and it would have been too late. Nevertheless, whatever may be our opinion as to the desire of these firms to sell to Alsberg, two of these witnesses for the two firms of Hood, Bonbright & Co., and J. T. Way & Co., viz.: Cregor and Marter, explicitly say that the line of credit of these firms was due to, and based on Alsberg's statements as to his property—and on this testimony we must rest as true and say that fraud in the shape of false representations in these cases has been proven —false representations to the financial member in the one instance and to the salesman in the other—and were this the only

fraud the petitioner would be. discharged from arrest in all but these two suits. But on a careful examination of the testimony, I am compelled to decide as a fact proven convincingly, that the petitioner for discharge intended at the time he purchased these goods, for the price of which the arresting creditors have brought suit, not to pay for the same, either in whole or in part, it is immaterial which.

I shall not enter into the testimony in detail, but shall speak of the prominent facts, which, taken altogether and in their natural relation to each other, have produced this conviction.

1st. The greatly increased later purchases in the months of April, May, and June, 1876, by which he stocked his store to repletion, which cannot be accounted for by any ordinary hypothesis of the necessities and demands of the trade. It is in evidence that business was materially falling off; ordinary prudence and commercial integrity should have induced diminished instead of increased purchaser's obligations.

2d. The whole manner, demeanor, and conduct of Alsberg to his creditors was indicative of fraud perpetrated and fraud intended.

It is true, by the proof in this cause and Alsberg's own confession, that he was much more than solvent when he offered the forty per cent. to his creditors. He stated that his stock was worth eighteen thousand dollars to one witness. He stated to another that it was worth fifteen hundred dollars. Mr. Albertson, an exceedingly careful and reliable witness, said that on the 18th of July, at the meeting of creditors, the stock in store was worth fifteen thousand. Freeman, Alsberg's clerk, placed it from thirteen to fifteen thousand. Mr. Crow also placed it about fifteen thousand shortly before the creditors' meeting. Now place this stock at the lowest figure, two thousand lower than the estimate of Albertson, say ..$13,000
Then add...................... 2,000 bond.
(Returned as assets) due him
  per J. Buxbaum............ 2,500 bond.

And we have the total.... ....17,500
The creditors' debts were but...13,000

Leaving a balance of......... $4,500
in Alsberg's favor. No wonder the creditors would not accept an offer made under such an exhibit.

3d. There is a manifest disappearance of a large mass of valuable merchandise, between the failure, 18th July, 1876, and the day of sale, 20th October, which is utterly unaccounted for. Now there is just the difference between fifteen thousand, as estimated by Albertson and others as its value at 18th July, and two thousand, as valued on the day of sale by Mr. Meehan, an experienced and skillful merchant, viz.: the sum of thirteen thousand—a difference of sixteen thousand, if estimated at eighteen thousand—the value admitted by Alsberg on one occasion. Now, it must be remembered that, from the time of this failure, none of these many creditors ever received one cent on their claims. He then owed no other debts, except two or three hundred dollars, which he paid off. What has become of these goods; and, if sold, what has become of the money—where is it, who has it? Mr. Alsberg can explain, and he does not offer to do so. He sits by, day by day, and hears himself denounced for vile fraud, and he opens not his mouth in his own defense. He has a right to demand to be sworn to vindicate his character. The United States, with liberal policy, in furtherance of justice, permits all persons to be witnesses in their own favor except in criminal cases. What would a man, conscious of rectitude, do in defiance of a battery of sharp cross-examining and torturing lawyers? There is only one inference to be drawn from this silence, and that is fraud.

4th. The circumstances connected with the execution of the judgment bond to Rosa Buxbaum, and the consideration therefor, are, to say the least, suspicious. The levy on the goods before petition in bankruptcy, and without making a trust for the benefit of his creditors, shows shrewd management to defeat the rights of creditors, in which Alsberg was certainly engaged as a party. From these and other considerations which might be mentioned, I believe that Alsberg, when he bought these goods, did not intend, either in whole or in part, to pay for them. And if such be the fact, what is the law arising on that fact? The conclusion to which I arrive, from reason and the slight examination of authorities I have been enabled to make, is that when A, at the time he purchases a stock of goods of B, intends either in whole or in part not to pay for them, he commits a fraud, and in the language of the act of congress has "created" a "debt" by "fraud." B certainly understands that A means to pay for his goods. He promises to do so. This promise is of the essence of every such contract. B would not think of selling if he supposed that A had not made a bona fide promise to pay, and he parts with his goods on the strength of this promise. He acts on a promise made. It is not false representation by words, but it is deception by concealing an intention he entertains, which, if communicated to the seller, would at once determine him not to part with his goods. The law on this subject is laid down by the supreme court of New Hampshire, from which I will quote. Stewart v. Emerson, 8 N. B. R. 462. Under this impression of the facts of this case and the law arising thereon, I must remand the petitioner to the custody of the sheriff of New Castle county.

BRADFORD, District Judge, [on petition for rehearing.] I have given attentive consid-

eration to the arguments on a rehearing of the habeas corpus case hitherto decided by me. The grounds urged by the petitioner's counsel for the discharge of the prisoner, and an injunction against all proceedings against him until the question of his discharge in bankruptcy shall have been determined, were twofold.

1st. That the court could inquire into no other question than the provability of the debt, that there was no doubt of that fact, and therefore that the court erred in refusing to discharge the prisoner.

2d. That if the prisoner was liable to arrest under § 5107, Rev. St., there was no legal proof of that fact adduced before the court as to justify it in remanding him. This is the substance of the objection to the act of the court expressed in a few words.

In Re Robinson, [Case No. 11,939,] Judge Nelson decided that the various sections of the Bankrupt Law must be construed together; that by the 21st section of the bankrupt law, (corresponding to 5105, Rev. St.,) standing alone, one who had proved a debt was denied the right of maintaining a suit at law or equity for the same against the bankrupt, and waived all right of action and suit against him, and all proceedings and judgments begun should be deemed discharged. But, says he, this section must be construed in connection with the 33d section, (section 5117, Rev. St.,) making all debts contracted in fraud binding on and unreleased against the bankrupt, notwithstanding his discharge. Under the one section, if the creditor has proven his debt, his debt is discharged and any judgment obtained thereon. Under the other, the debt being provable, and, in the case reported, actually proved, it having been contracted in fraud, is not discharged; and where bankrupt was in prison on an arrest for such a debt, the court refused to discharge him or to release the bail. Says Judge Nelson: "The 33d section (section 5117, Rev. St.) must be regarded at least as taking a debt of this character out of the 1st clause of the 21st section (i. e., section 5105, Rev. St.), and hence that the judgment in question is not discharged or surrendered, nor is the bankrupt entitled to be released from the arrest or his bail from the bail bond, if the debt was one created by fraud." Now, this reasoning will apply a fortiori to creditors not having proved their debts (though provable); for they shall only be "stayed" to await the determination of the court in bankruptcy on the question of the discharge, and are not held to have waived all rights from suits and unsatisfied judgments. I consider this as high authority, 1st, on the point: that a debt contracted in such fraud as is mentioned in section 5117, Rev. St., is taken out of the scope and operation of section 5106; Id., so far as to prevent the discharge of a bankrupt from imprisonment under the state laws on such debt. This court also approves the position taken in the court below—that where the record disclosed a case of fraud, the court would not inquire beyond the record to call in question its verity in a bankrupt court.

Martin Alsberg was arrested by virtue of the state law, which authorized capiases ad respondendum in certain cases, that is, under circumstances of fraudulent and improper conduct on the part of the debtor mentioned in the act, and sworn to by the plaintiff. The affidavit required by the law to be made as the foundation of the right to arrest is as follows: "That to the best of the plaintiff's belief, the defendant has absconded, or is about to abscond, from the place of his usual abode," or "that the defendant is justly indebted to the plaintiff in a sum exceeding fifty dollars, and that he verily believes the said defendant has secreted, conveyed away, assigned, settled or disposed of either money, goods, chattels, stock, securities for money for other personal estate, or real estate, of the value of more than one hundred dollars, with intent to defraud his creditors." The plaintiff is moreover to specify and set forth in his affidavit the supposed fraudulent transactions. It is provided that this act shall not apply to cases for libel, slander, or injury to the person or property, accompanied by violence, if any affidavit of the cause of action be filed with the praecipe. This act was passed at Dover, 1875, and was a modification of the law as it formerly stood, allowing a capias ad respondendum in all actions at law upon contracts, without any affidavit of fraud. The capiases in these suits against the bankrupt were in due form. They did not allege and swear to debts contracted in fraud, or under any of the circumstances of fraud mentioned in section 5117, Rev. St. They could not do so, for the grounds of arrest under the state law were not for such fraud as discharged the debts, yet in point of fact the debts may have been of that character. The arrests in these cases, then, supposing there had been no act of congress granting immunity to certain persons from such arrests, would have been in all respects legal and regular.

Section 5107, Rev. St., on bankruptcy, is in these words: "No bankrupt shall be liable, during the pendency of the proceedings in bankruptcy, to arrest in any civil action, unless the same is founded on some debt or claim from which his discharge in bankruptcy would not release him." His privilege, or immunity, or exemption from arrest depends upon the fact of the debt being released by his discharge. If it is unreleased he is without the immunity from arrest as provided for in this section as completely as if there had been no such provision in the Bankrupt Law. It must be kept in mind that the power of arrest is a state power, a power not conferred by act of congress, and that the bankrupt act has conferred no such power, but has only interposed its shield to protect the bankrupt from arrest by state authority for

a dischargeable debt, no matter how many fraudulent circumstances otherwise may surround it.

When the bankrupt is thus arrested by the authority of the state law and claims the immunity and privilege aforesaid, he must make it appear to the satisfaction of the court that his case comes within the exemption or privilege granted. If he does, he is discharged from arrest. If he does not, he is remanded to prison. If he makes it appear that his debt is dischargeable, that is, that it is not tainted with any of the kinds of frauds enumerated in section 5117, Rev. St., which prevent its being released by the discharge of the bankrupt, he is within the exemption or privilege extended by section 5107, Rev. St. If he cannot do this, he is not within the privilege or exemption aforesaid, and must be remanded.

In connection with this fraud the counsel for the petitioner who has been heard on this reargument has cited the following cases: In re Rosenberg, [Case No. 12,054;] In re Migel, [Id. 9,538;] In re Duncan, [Id. 4,131;] In re Schwartz, [Id. 12,502.] In Re Rosenberg, the bankrupt had been arrested, but was out on bail, and it was no part of the proceedings to have the bankrupt discharged from arrest, or his bail discharged; but it was to have the other proceedings of the suit, looking to the obtaining of a fraudulent judgment, stayed until the question of discharge in bankruptcy was settled. Hitherto it had been thought by some, among whom was Judge Blatchford himself, that the provisions to stay suits on provable claims did not apply to claims which were not released by discharge. Now this decision simply reverses that opinion, and permits a stay of proceedings. But the judge, in the close of his opinion, says: "I think it proper to say that this construction of the 21st section has no application to the last clause of the 26th section in regard to the liabilities of a bankrupt to arrest. By the specific provision of that clause (section 5107, Rev. St.) the bankrupt is entitled to be relieved from arrest if the arrest is founded on a debt from which his discharge, if granted, would release him, and this court is required, so long as the question of a discharge is undetermined, to inquire if the arrest is founded on such debt." So that this case is a clear authority against discharging the prisoner when arrested under section 5107, and the fact of the inability to be released from the debt is proven. It is also authority as to the duty of the court to inquire into the latter fact "so long as the question of a discharge is undetermined." In re Migel sustains precisely the same legal positions, with the exception that there was an express refusal to discharge the prisoner bankrupt. It is direct authority against the discharge of prisoner when arrested under section 5107, and proof of the character of debt which prevents his release. In re

Duncan [Case No. 4,131] has no bearing whatever on the right of the prisoner to immunity from arrest during proceedings in bankruptcy. In re Schwartz [Id. 12,502] has no application to this case, touching the right of arrest.

In fact, no case has been adduced, and I doubt whether any case can be, restraining from arrest under section 5107, Rev. St., where it is proved that the debt was not released by the discharge of the bankrupt. But repeatedly such bankrupts have been remanded to prison. The general order of the supreme court of the United States, prescribed for the government of proceedings in bankruptcy, has been cited as settling this question of immunity from arrest in favor of the prisoner. It is claimed that it amounts to an authoritative construction of the supreme court of the disputed provisions of the bankrupt act. I do not think so. Judge Blatchford and Judge Nelson did not think so, and they decided that the rule was not intended to apply to cases where a bankrupt was arrested for a debt not discharged under section 5107, Rev. St. Indeed, this is the only rational construction which I think can be given to these apparently conflicting provisions. The result is that all parts of the act have efficacy given to them. The result of the authorities is that, when a debt is provable, all actions against the debtor, pending proceedings in bankruptcy, shall be stayed, including arrests, with the exception that if the bankrupt has been arrested on a debt not dischargeable, he shall not be released from arrest by the bankrupt court. We consider then that it is established beyond a doubt, that a bankrupt prisoner who has been arrested, pending proceedings in bankruptcy, for a debt contracted in fraud, cannot on a habeas corpus be released from such imprisonment.

The next question to be settled (and it was the second point made by the counsel for the petitioner) is: How is the court to determine the question of fact on which the petitioner's right to discharge, or the creditor's right to continue the imprisonment, depends? What is the evidence by which he is to be governed? It will be seen that section 5107, Rev. St., prescribes no rule of evidence by which the court of bankruptcy shall be guided in determining the fact of the release of the debt on which the arrest is made. Upon some reflection, I have come to the conclusion clearly in my own mind, that it is the duty of the court to examine diligently all legal evidence brought before it from any quarter whatever, tending to show that a debt not dischargeable by the discharge of the bankrupt has or has not been contracted.

There is an apparent conflict of authority on this point. For limiting the scope of inquiry may be cited Judge Blatchford and Judge Nelson, in Re Robinson, [Case No.

11,939,] already cited; Blatchford, in Re Valk, [Id. 16,814.] In Re Kimball, [Id. 7,-768,] Judge Blatchford goes so far as to say: "This court only passes on the question whether the state court has founded its arrest on a claim, which, on the face of the papers which were filed before it as the foundation for the arrest, is a claim from which the debtor would 'not be discharged in bankruptcy.'" Lowell, in Re Devoe, [Id. 3,843,] is for confining the evidence. In Re Migel, [Id. 9,538,] Judge Blatchford takes the same view, and also in Re Kimball, [Id. 7,767.] In Re Glaser, [Id. 5,474,] Judge Blatchford thinks the case should be investigated by the court. He says, "It is a disputed case, which cannot be decided on ex parte affidavits," and offers, "if the bankrupt desires it, to take testimony before a referee." In Re Williams, [Id. 17,700,] Judge Drummond, circuit judge for the western district of Wisconsin, says: "This objection seems to proceed on the theory that the complaint and facts stated therein, i. e., in state proceedings, bound the bankrupt court. This is not correct, though it is true that the bankrupt law declares that the proceedings in bankruptcy shall not affect debts of a certain character, and among others those which have their origin in fraud, and further, the discharge of the bankrupt shall not operate as a release. It is to be observed that this is a question which the bankrupt court has a right to determine, and that a statement in a declaration or complaint made by a party in a state court does not bind the bankrupt court." So that I consider this question an open one, to be decided on those principles which shall be in harmony with the intent and purpose of the bankrupt law. The bankrupt law was meant to be uniform in its operation. Privileges are not to be accorded to either creditors or bankrupts in one district which are not equally extended to creditors and bankrupts in other districts.

The liability to imprisonment, or immunity from the same, depends on a fact. That fact is whether the debt for which he was arrested by state authority was dischargeable, or not, by the discharge in bankruptcy. I think it has nothing to do with the reasons or grounds of the arrest given in the affidavits upon which it was granted. It is manifest that congress intended to punish this fraud where in fact it existed, and to prevent an arrest of the bankrupt for such debt not created in such fraud. If the position be correct, that the liability to arrest or discharge depends on the reasons given by the state authorities for the arrest, then there is no mode by which the creditors of the bankrupt can claim the benefit of the arrest granted by the act of congress, unless the reasons filed for the arrest consist of such acts of fraud as would, under the act of congress, prevent a discharge of the debt, and as in this state no such reason can be

filed (as may also be the case in many other states), it follows that here (and in other states having like civil process) a bankrupt may not be imprisoned during proceedings in bankruptcy for a debt which is not discharged in bankruptcy, in defiance of section 5117, Rev. St., which permits it. Creditors over the district border, where reasons for arrest such as will discharge the debt can be filed, can have a hearing and continue the arrest if they prove their debt not dischargeable; while no such privilege can belong to the creditors in this district, because by the law of the state no such reasons or grounds of arrest can be sworn to, as will discharge the debt. So, too, if this theory be correct, bankrupt prisoners in different districts may enjoy exemption from arrest, not as they prove their debts, on which they are imprisoned, are dischargeable in bankruptcy, but as their creditors may or may not be able to file reasons for their arrest which would, if true, make their debts undischargeable in bankruptcy.

I think no such inequitable and partial results could have been contemplated by the framers of the bankrupt act, and hence conclude that when the liberty of the bankrupt is at stake, or the right of the creditor to arrest for a debt contracted in fraud, the question of discharge from arrest depends upon the determination of the act of fraud, and not upon the reasons which may have been filed in the state courts for the arrest. Where the liberty of the prisoner depends upon the fact that his debt is dischargeable by his discharge in bankruptcy, and he tenders proof to maintain the allegation, is it not a strange proposition that he shall be denied the right to prove his right to release from imprisonment because an ex parte affidavit had been made in the state courts that he had contracted the debt under such circumstances of fraud as that his debt would not be released by his discharge in bankruptcy? This appears strange, because it affects the personal liberty of the bankrupt. But the rights of the creditors to arrest for debts not dischargeable in bankruptcy are equally sacred, and the proposition to me is equally strange that they should be denied the power to hold under arrest one legally arrested for other reasons filed than those which will release the debt, when they make the allegation, and offer to sustain it by proof, that the petitioner cannot bring himself within the exemption from arrest granted by congress, by reason of the fact that the debt on which he was arrested was contracted in fraud. And I think this view of the law is made apparent by the provisions of sections 760, 761, Rev. St., in relation to the writ of habeas corpus.

Now, in the absence of directions as to the specific evidence required in the provisions of the bankrupt law, these sections appear to me to be conclusive on all ques-

tions of prima facie evidence made out by state proceedings—or the absence of evidence as to the sufficient grounds of arrest in the state proceedings. "The petitioner may deny any of the facts set forth in the return, or may allege any other facts that may be material in the case." Surely he may deny that he has been arrested for a debt contracted in fraud, no matter what affidavits may have been made by state authority to the contrary, and surely he may allege that he has been arrested for a dischargeable or releaseable debt, though it does not appear from the state proceedings that he was arrested by reason of the debt being contracted in fraud. These sections render clear the duty of the court to hear all legal testimony in the cause, and go further; they permit "the return and all suggestions made against it" to be amended by the leave of the court, so that thereby the material facts may be ascertained. The question of fact as to the creation of a debt not dischargeable by the discharge of the bankrupt, having been already passed on, it only remains for the court to say that the motions to discharge and enjoin against any further proceedings are refused. As a stay of proceedings is not desired unless in connection with the discharge of the prisoner, no order is made in reference to that matter.

Thereupon the bankrupt applied to the United States circuit court for the district of Delaware, to have said proceedings and orders supervised and set aside, and the bankrupt discharged from imprisonment, and for injunctions to restrain the plaintiffs in said writs from prosecuting their actions until the final determination of proceedings in bankruptcy. The case was argued before Hon. William Strong, justice of the supreme court of the United States, who rendered his decision, June 29, 1877, as follows:

STRONG, Circuit Justice. After argument and consideration, it is ordered that the action of the district court be approved, and this petition is dismissed.